No. 22-1617

In the

# United States Court of Appeals
## For the Fourth Circuit

———————————

REMY HOLDINGS INTERNATIONAL, LLC,

*Plaintiff-Appellant,*

v.

FISHER AUTO PARTS, INC.,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Western District of Virginia at Harrisonburg
Case 5:19-cv-00021-EKD-JCH

———————————

**BRIEF OF APPELLEE**

———————————

Matthew A. Fitzgerald
Ryan D. Frei
Lyle D. Kossis
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

September 26, 2022

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 22-1617          Caption: Remy Holdings International, LLC v. Fisher Auto Parts, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Fisher Auto Parts, Inc.
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?          ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?          ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew A. Fitzgerald          Date:   September 26, 2022

Counsel for: Appellee Fisher Auto Parts, Inc.

ii

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1

ISSUES PRESENTED.............................................................................3

STATEMENT OF THE CASE.................................................................4

I.    For nearly 20 years, Fisher had a supply relationship with USA
      Industries..................................................................................4

II.   Remy acquired USA Industries and became Fisher's primary supplier. .......9

III.  Remy developed severe and sustained performance issues. .........................11

IV.   Procedural History .................................................................13

SUMMARY OF ARGUMENT ...........................................................16

ARGUMENT .......................................................................................18

I.    The district court properly held that the USA Core Policy was
      admissible despite the statute of frauds. .......................................18

      A.    This Court's review is deferential. ....................................19

      B.    The district court properly rejected Remy's various statute of
            frauds arguments on five independent grounds. ...............................20

            1.    The USA Core Policy is not a "contract for the sale of
                  goods." ....................................................................21

            2.    The USA Core Policy satisfies the exception for written
                  confirmations of oral agreements. ...........................................22

            3.    The USA Core Policy satisfies the party-admission
                  exception. ................................................................23

            4.    The USA Core Policy was incorporated into the signed
                  2012 LOU. ...............................................................25

            5.    The general Virginia statute of frauds also does not apply
                  for other reasons.......................................................26

      C.    Any error in admitting the USA Core Policy was harmless. .............28

II.   The district court properly determined on summary judgment that
      Remy committed the first material breach and Fisher did not waive it. ......30

A.  Undisputed facts and concessions established that Remy committed the first material breach when it failed in its obligation to keep Fisher competitive. ..................................31

B.  The APSG term sheet is a sideshow that cannot help Remy. ...........34

C.  The district court properly concluded that Fisher did not waive the first material breach defense..........................................................36

D.  Remy was not entitled to jury instructions on waiver, laches, or estoppel..............................................................................................41

E.  Any error in granting judgment against Remy's breach of contract claims was harmless. .........................................................42

III.  Remy abandoned its unjust enrichment claim, and in any event, the express contracts bar it..............................................................................44

IV.  Remy is entitled to nothing under the Hoffman and Core Base Agreements because the jury already accounted for them. ..........................46

V.  The district court properly allowed Kornafel to testify about industry practices. .................................................................................................48

A.  Remy waived any objection to Kornafel's testimony........................48

B.  The district court properly allowed Kornafel to testify about industry practices.................................................................................50

CONCLUSION ......................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bender-Miller Co. v. Thomwood Farms, Inc.*,
  211 Va. 585 (1971) .................................................................................36

*Bright v. Tishman Const. Corp. of New York*,
  1997 WL 419195 (S.D.N.Y. July 25, 1997)...........................................47

*Brookshire v. C.F. Sauer Co.*,
  63 F. App'x 736 (4th Cir. 2003) ...........................................................45

*C. Porter Vaughan, Inc. v. DiLorenzo*,
  279 Va. 449 (2010) ................................................................................19

*CGI Fed. Inc. v. FCi Fed., Inc.*,
  295 Va. 506 (2018) ................................................................................45

*Countryside Orthopaedics, P.C. v. Peyton*,
  261 Va. 142 (2001) ................................................................................38

*Durkin v. MTown Constr., LLC*,
  2018 WL 1304922 (Tenn. Ct. App. Mar. 13, 2018)..........................46

*Fine v. Baer*,
  2016 WL 4472965 (M.D. Fla. Aug. 23, 2016)....................................42

*Gambill v. United States*,
  276 F.2d 180 (6th Cir. 1960) ...............................................................32

*George v. City of Long Beach*,
  973 F.2d 706 (9th Cir. 1992) ...............................................................44

*Hansen v. Isuzu Motors Ltd.*,
  289 F. App'x 621 (4th Cir. 2008) ........................................................44

*Hardy-Latham v. Wellons*,
  415 F.2d 674 (4th Cir. 1968) ...............................................................27

*Horton v. Horton*,
  254 Va. 111 (1997) ...............................................................33, 36, 37, 38

*Huey v. Super Fresh/Sav-A-Ctr., Inc.*,
   2009 WL 3834218 (E.D. La. Nov. 16, 2009).................................................47, 48

*Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*,
   912 F.3d 316 (6th Cir. 2018) .................................................42

*Kozlowski v. Hampton Sch. Bd.*,
   77 F. App'x 133 (4th Cir. 2003) ...........................................28

*Logistics Transp. Co. v. Timber Trucking Co.*,
   141 F.3d 1158 (4th Cir. 1998) ..............................................25

*MEECO Mfg. Co. v. Imperial Mfg. Grp.*,
   2005 WL 8172679 (W.D. Wash. Mar. 11, 2005).................................42

*Mulugeta v. Ademachew*,
   407 F. Supp. 3d 569 (E.D. Va. 2019) ....................................46

*Noel v. Artson*,
   641 F.3d 580 (4th Cir. 2011) ...............................................41

*Reynolds v. Dixon*,
   187 Va. 101 (1948) ........................................................19

*Ricks v. Sumler*,
   179 Va. 571 (1942) ........................................................45

*Sardis v. Overhead Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) ..............................................51

*Smith v. Baltimore City Police Dep't*,
   840 F.3d 193 (4th Cir. 2016) ..............................................19

*Stuarts Draft Shopping Center, L.P. v. S-D Assocs.*,
   251 Va. 483 (1996) ....................................................37, 38

*Tandberg, Inc. v. Advanced Media Design, Inc.*,
   2009 WL 4067717 (E.D. Va. Nov. 23, 2009) .................................38

*Travelers Indem. Co. v. Scor Reinsurance Co.*,
   62 F.3d 74 (2d Cir. 1995) .................................................51

*United States v. Abu Ali*,
  528 F.3d 210 (4th Cir. 2008) ...............................................................29

*United States v. Grullon*,
  996 F.3d 21 (1st Cir. 2021)...................................................................49

*United States v. Neal*,
  78 F.3d 901 (4th Cir. 1996) ..................................................................50

*United States v. Wilson*,
  788 F.3d 1298 (11th Cir. 2015) ............................................................50

*Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc.*,
  267 Va. 642 (2004) .................................................................37, 39, 40

*Walmart, Inc. v. Cuker Interactive, LLC*,
  949 F.3d 1101 (8th Cir. 2020) ..............................................................51

*Wickersham v. Ford Motor Co.*,
  997 F.3d 526 (4th Cir. 2021) .....................................................29, 30, 48

*Williams v. W.D. Sports, N.M., Inc.*,
  497 F.3d 1079 (10th Cir. 2007) .....................................................43, 44

*Yates v. Pinellas Hematology & Oncology, P.A.*,
  21 F.4th 1288 (11th Cir. 2021) .............................................................49

**Statutes**

Va. Code § 8.1A-303 .................................................................................35

Va. Code § 8.2-106(1)...............................................................................21

Va. Code § 8.2-201 .............................................................18, 20, 21, 22, 23

Va. Code § 11-2(8)...........................................................18, 20, 26, 27

**Rule**

Fed. R. Civ. P. 8(c)(1)...............................................................................27

## **INTRODUCTION**

After losing a weeklong jury trial, Remy on appeal improbably asserts that the district court committed more than ten errors. This Court should affirm the district court's rulings and the jury verdict of $1.8 million to Fisher Auto Parts.

For many years, Fisher bought rotating-electrical parts (car starters and alternators) from Remy's predecessor, USA Industries. Manufacturing companies have an interest in the return of worn-out parts, called cores, that are useful in "remanufacturing" rotating-electrical parts—akin to using scrap metal in recycling.

Everyone agrees that Fisher had a 1-for-1 exchange program with USA and then Remy, so Fisher had to return one core to the supplier for every unit that Fisher bought. After Remy acquired USA, its supply relationship with Fisher soured. Remy breached its contract by, *inter alia*, failing to adequately or timely fill Fisher's orders, and eventually, Fisher terminated the relationship.

Remy then demanded $6 million from Fisher, asserting that it owns the cores associated with every unit in Fisher's rotating-electrical inventory. But Remy had no records to show that Fisher had failed to meet its 1-for-1 return obligation, and Fisher's records proved the opposite. So instead, Remy argued that its predecessor, USA, owned Fisher's core inventory. The problem for Remy was that *all* USA personnel testified repeatedly that USA did not buy or own Fisher's core inventory. Nor did Remy itself ever buy or own it.

1

After hearing the conflicting stories at trial, the jury rightly concluded that Remy did not own Fisher's core inventory. It rejected Remy's conversion claim and found that Remy's failure to adequately supply Fisher with rotating-electrical parts—and the lost sales Fisher suffered as a direct result—warranted a $1.8 million judgment against Remy for breach of contract.

On appeal, Remy urges that the district court made multiple errors in the admission of evidence, the partial summary judgments (some based directly on its own counsel's concessions), the amount of damages, and the jury instructions. No such errors occurred. Judge Dillon developed extensive knowledge of this case through three years of pretrial maneuvers, and her decisions were right.

Regardless, Remy was allowed to present its case to the jury in the form of a conversion claim, asserting that Remy was the rightful owner of Fisher's cores. The jury rejected that claim. In short, the jury believed the testimony of both Fisher *and* former USA *and* Remy employees, who jointly explained and agreed on the terms of the old agreements that make clear Fisher owns the cores.

Remy's dogged pursuit of its claim, in the face of a mountain of evidence, now persists even beyond the judgment against it. Once a major auto-parts manufacturer, Remy is now unwilling or unable to even secure an appeal bond for the $1.8 million judgment. Efforts by Fisher to collect its judgment so far have

2

found nothing but a financially drained ghost company—a holding company with no American business left other than this litigation.

There is no reason to overturn the rulings below or the jury's verdict on appeal. This Court should affirm.

## ISSUES PRESENTED

1.      Did the district court act within its broad discretion on evidentiary matters in admitting the USA Core Policy?  (Yes.)

2.      Did the district court properly conclude at summary judgment that Remy committed the first material breach of contract, and that Fisher did not waive that breach?  (Yes.)

3.      Did the district court properly conclude that Remy cannot maintain a claim for unjust enrichment because Remy's counsel agreed to its dismissal before trial, and because controlling contracts eliminate unjust enrichment claims?  (Yes.)

4.      Did the district court properly conclude that Remy has no right to set-off damages under the Hoffman and Core Base Agreements, because the jury already subtracted those numbers from its verdict?  (Yes.)

5.      Did the district court act within its broad discretion on evidentiary matters in allowing Pete Kornafel to testify about industry practices, when Remy never objected during the trial to what Kornafel was explaining?  (Yes.)

## STATEMENT OF THE CASE

**I.     For nearly 20 years, Fisher had a supply relationship with USA Industries.**

Fisher is an automotive parts warehouse distributor.  JA2926.  As a warehouse distributor, Fisher buys automotive parts from suppliers and then sells those parts, mostly to mechanics.  JA2140.  This case involves rotating-electrical products: starters and alternators.

Rotating-electrical products can be remanufactured after the part is used.  A used and inoperable rotating-electrical product is called a "core."  JA104.  Typically, when a vehicle with a dead starter or alternator arrives at an auto repair shop, the repair technician orders a rotating-electrical unit from a distributor like Fisher.  JA2237–39.  The mechanic then removes the old unit—the core—from the vehicle and returns it to Fisher.  JA2237–39.  Fisher returns the core to the supplier so that the supplier can use the parts from that core to remanufacture rotating-electrical products.  JA2140.

In 1997, USA Industries became Fisher's primary supplier of rotating-electrical products.  JA2140.  On the Fisher side, the current CEO Bo Fisher was the key relationship contact.  JA3068.  On the USA side, Frank Doria, a senior USA executive, managed the Fisher relationship.  JA2762.  USA's President, Vincent Trapani, was also involved in the Fisher/USA relationship.  JA220.  From 1997 through 2004, Fisher paid USA for rotating-electrical products and paid a

core deposit for each unit that it ordered. JA2773. After Fisher returned a core to USA, Fisher got its core deposit back. JA2773. For example, if the rotating-electrical unit cost $75 and the core deposit was $25, then Fisher paid $100 up front. After Fisher returned a core to USA, Fisher got its core deposit back.

Fisher and USA negotiated a new core program in early 2005. Bo Fisher and Frank Doria negotiated the new arrangement, and they memorialized it in the USA Core Policy. JA2785–87 (testimony), JA235 (copy of USA Core Policy). The Policy outlined the "core devaluation program" to which USA and Fisher agreed. JA235. The plan was that Fisher would stop paying core deposits to USA on new orders. JA235 ("Fisher would be billed at zero core value beginning January 1st, 2005"); JA235 ("Fisher would receive zero credit for cores."). When Fisher stopped paying core deposits, it had to begin returning one core to USA for every unit that Fisher bought. JA235. This program is known in the industry as a 1-for-1 exchange. JA2918, JA3027–28.

To ensure that Fisher met its 1-for-1 obligation, the parties agreed they would monitor the "net core balance (net cores purchased less returned)." JA235. "If Fisher buys more than is returned,"—*i.e.*, Fisher under-returns cores—Fisher "must pay USA the difference." JA235. "I[f] Fisher returns more cores than purchased,"—*i.e.*, Fisher over-returns cores—"USA credits Fisher the difference." JA235.

5

The USA Core Policy also set out that USA would provide credits to Fisher over a 12-year period, essentially incentive payments to keep Fisher buying large volumes of parts from USA. It acknowledged that Fisher was entitled to "change our supplier of domestic remanufactured electrical products" at any time. JA235. If Fisher stopped buying rotating-electrical parts from USA, the Policy stated that all credits from USA "would cease" and that Fisher would not have to repay USA for any credits received. JA235. The Policy made plain that USA did not buy Fisher's core inventory: "The net result is that the cores are wholly owned by Fisher at the end of this process." JA235.

The parties did not sign the USA Core Policy because USA's contracting practices were not "very formal." JA2764. Doria testified at trial that USA relied on "handshake" agreements and informal contracts with many of its customers. JA2764. Trapani, USA's President, likewise confirmed that USA often had "handshake" agreements. JA2759. USA even had similar unsigned "outlines" of its core programs with other customers. *E.g.*, JA233.

Mr. Doria confirmed at trial that he agreed to the USA Core Policy. Doria testified that while he worked at USA, he had authority to agree to either oral or written commercial terms with customers, including customer-specific "policies." JA2836; JA2741 (Trapani acknowledging that Doria had authority to create such programs for USA). Doria also confirmed that he negotiated the Policy with Bo

6

Fisher, agreed to it, and that he received the Policy in which Fisher retained ownership of the cores.  JA2794 (Doria trial testimony: "Q. But do you remember, in fact, receiving this at some point? A. Yeah. Q. And agreeing to it? A. Yes, I do.").  Doria further testified that the USA Core Policy was an "accurate recitation" of his understanding of the parties' core arrangement.  JA2792.

Mr. Doria testified that the core-devaluation credits outlined in the USA Core Policy were an incentive to "lock up the [Fisher] business for 12 years." JA2789.  He confirmed that these payments were "credits" that did not result in USA "taking possession of anything."  JA2789.  He explained that USA offered this incentive to Fisher because Fisher was one of USA's three biggest customers and had significant leverage.  JA2762–63, JA2789–91; JA223 (Trapani).  And Daniel Billie, one of Fisher's industry experts, opined at trial that core-devaluation credits were a common incentive in the automotive aftermarket in the mid-2000s, and that they did not necessarily mean the supplier was buying the customer's core inventory.  JA2876–79.

At least seven fact witnesses testified that Fisher maintained ownership of the cores and USA/Remy did not, including five former USA/Remy employees. JA3070 (Bo Fisher, Fisher employee); JA2941–42 (Haan, Fisher employee); JA2814–15 (Doria, former USA/Remy employee); JA2741–42 (Trapani, former USA employee); JA3165 (Bostic, former Remy employee); JA875–76 (McGuire,

7

former USA/Remy employee); JA2615 (Vollbrecht, former Remy employee). In Doria's words: "[W]e didn't own [Fisher's] cores or inventory." JA2801.

In 2012, Fisher and USA signed a Letter of Understanding (2012 LOU) to outline various aspects of the parties' relationship. The 2012 LOU declared that "Fisher and USA have entered into a mutually beneficial agreement and the relationship has remained strong and constant." JA3485 (¶ 1). The LOU specially identified the credits in the USA Core Policy and stated that "Fisher core devaluation monies will be sped up" and paid out over the next 36 months. JA3485 (¶ 4). The 2012 LOU also confirmed that preexisting "programs"— including the one outlined in the USA Core Policy—were left unchanged. "Nothing contained in this Agreement shall supplant, reduce or eliminate any currently-existing *program* between Fisher and USA other than the specific points addressed. *Other agreements exist between the parties and these shall continue*." JA3485 (¶ 10) (emphases added).

The 2012 LOU also addressed the potential sale of USA. The LOU stated that "[s]hould USA sell part or all of their business or stock or engage in any other type of merger . . . , all aspects of this contract and the current program shall continue forward. . . . In no way will Fisher be penalized or will the Fisher program . . . change in a negative manner in the event of a sale, merger, or any other type of M&A activity." JA3485 (¶ 11). Remy bought USA in 2014.

8

## II.    Remy acquired USA Industries and became Fisher's primary supplier.

In 2013, Remy began conducting due diligence for its acquisition of USA. Remy spoke to senior USA officers, including Doria and Trapani.  JA2743–47.  At trial, when Trapani was asked, "Did USA industries own Fisher's core inventory at the time of the 2014 sale to Remy?" he testified "No, we did not."  JA2741–42.  When asked further, "Was USA Industries in the process of buying Fisher's core inventory at the time of the 2014 sale to Remy?" he said, "No, we were not."  JA2742.  Likewise, when Trapani was asked, "Did USA Industries represent to Remy that it owned Fisher's core inventory at the time of the 2014 sale to Remy," he said, "Absolutely not."  JA2742.  Even more pointedly, when Fisher's counsel asked, "[D]id USA represent to Remy that any core-related amounts were due from Fisher at the time of closing?," Trapani responded, "Absolutely, absolutely, positively, swear on my kids: No, we did not."  JA2747.

Remy and USA executed an Asset Purchase Agreement (APA) to close the acquisition.  JA2798.  The APA's accounts receivable provision referred to a schedule that "sets forth the core return obligation of all Customers by Customer."  JA2799.  That schedule listed the 21 customers whose cores USA owned, but did not list Fisher.  JA2801.  Likewise, shortly after Remy bought USA, Frank Doria—who stayed on with Remy and kept serving as the primary relationship manager with Fisher—sent letters to the customers on that core-return schedule to confirm

9

that USA owned their core inventory, but he never sent one of these letters to Fisher.  JA3603–18 (letters), JA2802–03 (Doria testimony).

After Remy bought USA, Fisher and Remy executed several agreements.  In 2015, Fisher and Remy signed a Letter of Understanding (2015 LOU).  JA125. The 2015 LOU has three particularly relevant provisions.  The first provision explained that "REMY wishes to continue to fully supply Fisher with all aspects of past Fisher/USA agreements and Letters of Understanding, except as specifically included in this Amendment."  JA125 (¶ 1).  The second provision stated that "[t]his letter of understanding is predicated upon REMY keeping Fisher competitive in the marketplace in every way," and that "Remy shall take best efforts to ensure that Remy provides competitive products to Fisher compared to similar competitive products sold under the same market conditions."  JA125 (¶¶ 2–3).  Given Remy's duty to keep Fisher competitive, the contract stated that if Remy fails to keep Fisher competitive "in Fisher's opinion then Fisher can change suppliers and end this contract with as little as 60 days of advance notice."  JA125 (¶ 2).  The third relevant provision stated, like the 2012 LOU, that "[n]othing contained in this Agreement shall supplant, reduce or eliminate any currently-existing program between Fisher and REMY."  JA125 (¶ 7).

Fisher and Remy signed another Letter of Understanding in 2016.  JA134. That LOU largely restated the 2015 LOU with only minor changes.  JA134.  And

10

the 2016 LOU included the same three provisions outlined above from the 2015 LOU.  JA134 (¶¶ 1–3, 7).

Between 2014 and 2018, Remy and Fisher signed five separate contracts. JA128, JA131, JA4802, JA4804, JA8225.  None stated or implied that Remy owned Fisher's core inventory, or had any right to be paid for it in the event Fisher ever terminated the relationship.  *E.g.*, JA128.

## III.    Remy developed severe and sustained performance issues.

Remy was involved in significant M&A activity during its four years dealing with Fisher.  Remy became Fisher's supplier when it bought USA in 2014.  In 2015, an automotive supplier named BorgWarner bought Remy.  JA2261.  Then in 2016, a private equity firm named Torque Capital Group bought Remy from BorgWarner.  JA2270.  And in late 2018, Remy sold all its North American operations to a competitor, BBB Industries.  JA2391.  Remy now has no active operations in North America, and the entity that sued Fisher is a holding company. JA7495.

When Torque bought Remy, it overhauled the company to try to cut costs and make it more profitable.  For example, Remy switched its software operations program, and Torque sought to overhaul Remy's senior management and change its culture.  JA1090 (email from Torque investor David Overbeeke stating that the software transition "caused us more headaches than I care to remember"); JA3548

11

(Overbeeke: "The REMY way needs to go the way of the dinosaurs!"); JA2377–78 (testimony from former senior Remy employee that Torque made Remy more "profit driven").

These changes brought serious and sustained performance issues that badly affected Remy's relationship with Fisher. David Nichols, Remy's former President, stated in an email that "the entire BW Remy sale [to Torque] cost us tremendously." JA3682. Jay Pittas, Remy's former CEO, testified that Remy's order-fill rates under Torque were a "disaster." JA266.

In 2017, the performance issues manifested most obviously in Remy's poor order-fill rates.[1] "Order fill" refers to the rate at which a supplier timely fills a customer's orders. JA1707, JA1083–84. That is, a supplier that fills 94% of a customer's order within a set time has a 94% order-fill rate for that order. Remy officers and employees repeatedly testified that a high order-fill rate was essential to keeping customers competitive. JA1707. And Remy documents and witnesses confirmed that competitive order-fill rates were in the low-to-mid 90s. JA1707–08, JA1114. Yet Fisher's order-fill data shows that during the 15-month period between March 2017 and May 2018, Remy's monthly order-fill rate never rose above 80% and was consistently in the 60s and 70s. JA1708, JA1114.

---

[1] The evidence of Remy's poor performance comes from the summary-judgment record, not from trial, because the district court appropriately resolved these issues at summary judgment after extensive analysis.

12

In 2017 and 2018, Fisher repeatedly complained to Remy about its poor fill rates. JA1710, JA1147–58. Bo Fisher told Remy that Fisher was "losing lots of sales," JA1710, JA1150, and that "[i]n my 30 full time years, I've never seen anything this bad." JA266–67. In response, Remy misled Fisher about the scope of the problems and the timeline for fixing them. JA1152–53, JA1090, JA1848, JA7118. Remy's own employees knew that Remy was "overpromising" Fisher about the items that Remy could ship. JA1848.

Apart from poor order-fill rates, Remy's performance suffered in other respects. JA1710–12 (describing failures in Remy's product line and customer service); *see also* JA162–69 (Bo Fisher declaration outlining Remy problems). Because of Remy's severe and sustained performance issues, Fisher exercised its right (as outlined in the 2015 and 2016 LOUs) in June 2018 to terminate the relationship.

After the Remy-Fisher relationship ended, Remy sent Fisher an invoice for nearly $6 million. JA1714. Remy claimed that it owned a core for each rotating-electrical product in Fisher's inventory. JA1714. Fisher did not pay, and Remy sued.

## IV.    Procedural History

Remy's Second Amended Complaint asserted four counts against Fisher. JA101–16. Remy asserted breach of contract, unjust enrichment, and conversion

13

claims against Fisher based on Remy's belief that it owned Fisher's core inventory. JA111–14.  Remy also asserted a separate breach of contract claim based on Fisher's allegedly improper termination.  JA112–13.

Fisher counterclaimed for breach of contract.  JA1854–70.  As relevant here, Fisher claimed that Remy breached its duty to keep Fisher competitive, which caused Fisher to lose product sales.  JA1854–70.

The district court granted summary judgment against Remy's improper-termination claim.  The court held that based on undisputed evidence of Remy's poor performance and Remy's concessions, Remy breached its duty to keep Fisher competitive in the marketplace through its severe performance issues.  JA1681 (Order), JA1306–07 (transcript).  Given Remy's breach, the district court held that Fisher properly exercised its contractual termination right in the LOUs.  JA1681.

Fisher then sought summary judgment (i) on Remy's breach of contract claim because Remy committed the first material breach, and (ii) on Remy's unjust enrichment claim because the parties' express contracts governed issues of core ownership.  JA1715–26.

The district court agreed with Fisher.  It held that Remy abandoned its unjust enrichment claim by agreeing that the express contracts govern the subject matter at issue.  JA2037.  The district court also held, consistent with its earlier ruling, that Remy breached its duty to keep Fisher competitive, that Remy's breach was

14

material, and that Remy's breach occurred before Fisher's alleged breach. JA2034–37. The district court further held that Remy's material breach established liability on Fisher's breach of contract claim, given that Remy's breach underlying both Fisher's first material breach defense and its affirmative claim was the same. JA2034–37. Thus, Remy went to trial on its conversion claim, and Fisher went to trial on the damages aspect of its breach of contract counterclaim.

At trial, the parties presented substantial evidence on whether Remy owned Fisher's core inventory. Both Fisher and Remy witnesses agreed that Fisher had a 1-for-1 exchange program with USA and then Remy. JA2569–70. Fisher presented documents that tracked Fisher's product purchases and core returns to Remy from January 1, 2015, through the end of the relationship—nearly the entire Fisher/Remy relationship—that showed Fisher *over*-returned cores to Remy. JA3263–68. Remy had no such set of full records at all, much less contrary ones. JA2574–75.

Fisher also presented evidence that at least five USA/Remy employees knew and fully understood all along that Remy did not own Fisher's cores. JA2801 (Doria); JA2742–43 (Trapani); JA3165 (Bostic, a former Remy Vice President of Sales, explaining that he even told Remy repeatedly that Fisher owned the cores); JA875–77 (McGuire testifying similarly); JA2615 (Vollbrecht); *see also* JA3603– 18 (Nichols stating in email that "the USA team state the USA company did not

buy the Fisher cores").  Fisher also proved that when Remy did buy and own a customer's core inventory, Remy did so in a signed contract stating so explicitly, but Remy conceded it had no such contract with Fisher.  JA2485–86.

After hearing five days of evidence, the jury found for Fisher on Remy's conversion claim.  JA3733.  The jury also found for Fisher on its breach of contract claim and determined that Remy's poor job as a supplier had caused Fisher $1,816,277 in lost sales.  JA3734.  Remy filed this appeal.

## SUMMARY OF ARGUMENT

**I.**    Remy's statute of frauds argument repeatedly misses the mark.  Remy contends that the unsigned USA Core Policy that Bo Fisher and Frank Doria negotiated was inadmissible.  This case is a terrible fit for the statute of frauds. That statute exists to protect parties from made-up, fraudulent alleged contracts, but here, *both sides*—both USA/Remy and Fisher personnel—repeatedly confirmed that they negotiated the Policy and that it accurately reflected their deal. Further, the statute of frauds does not apply for multiple, independent reasons, as the district court ruled—including that it was not a contract for the sale of goods, it was seen and never objected to by Remy's predecessor, it was incorporated into later signed writings, and USA/Remy's own witnesses admitted its propriety and accuracy.

**II.**     Next, Remy committed the first material breach when it failed to fulfill the "keep competitive" provision of the signed 2015 and 2016 Letters of Understanding.  Remy's own counsel told the district court that he agreed with Fisher's statement of undisputed facts—including that Remy's order-fill percentage for Fisher fell far below the industry standard in 2017 and 2018.

Nor did Fisher "waive" the first material breach, as a matter of law.  Remy contends that Fisher waived the first material breach defense by continuing to perform after Remy breached the agreement.  But the Supreme Court of Virginia has held that a party does *not* waive the defense if it objects in real time (as Fisher did) to the deficient performance.  Fisher cited this case law below, but Remy ignores it.  And because Fisher clearly did not waive that defense, Remy was not entitled to jury instructions on that point.

**III–V.**     The miscellaneous issues in Remy's brief do not warrant reversal.  The district court correctly dismissed Remy's unjust enrichment claim because Remy outright abandoned it, and on the merits, the claim fails because numerous express contracts here cover the same subject matter.  Remy is not entitled to damages under the Hoffman and Core Base Agreements because the jury's verdict already accounted for those amounts.  And though Remy complains about Pete Kornafel's expert testimony, Remy failed to object at trial and still

hardly identifies the supposedly inadmissible testimony.  Kornafel stayed well

within the wide boundaries afforded to industry experts.

## ARGUMENT

**I.    The district court properly held that the USA Core Policy was admissible despite the statute of frauds.**

Remy contends (at 24–36) that the unsigned USA Core Policy is

inadmissible under Virginia's statutes of frauds.  *See* Va. Code § 11-2(8); Va.

Code § 8.2-201.  The district court aptly ruled that the USA Core Policy was

admissible.  This Court can affirm that evidentiary ruling on at least *six* grounds—

that (1) the USA Core Policy was not a contract for the sale of goods at all,

JA1675; (2) it was received and never objected to by USA/Remy, JA1675–76; (3)

it was incorporated into a later signed writing, JA1675; (4) Remy witnesses

admitted that the USA Core Policy was real and a binding program for the parties,

JA1676; (5) Remy untimely raised the general statute of frauds, and, in any event,

Fisher was not "bringing" or "maintain[ing]" any action with the USA Core Policy,

JA2785; and (6) any error in admitting the USA Core Policy was harmless given

consistent testimony from both sides about the parties' core program and its agreed

terms.  On any or all of these grounds, the USA Core Policy was enforceable and

admissible.

### A.     This Court's review is deferential.

This Court "review[s] the district court's evidentiary decisions for abuse of discretion.  An abuse of discretion occurs only when the district court acts arbitrarily or irrationally in admitting evidence."  *Smith v. Baltimore City Police Dep't*, 840 F.3d 193, 200 (4th Cir. 2016).

There was nothing "arbitrary" or "irrational" about the district court admitting the USA Core Policy into evidence.  Even the purpose of the statute of frauds makes no sense in this case.  Statutes of frauds aim to ensure "reliable evidence of the existence and terms of certain types of contracts and to reduce the likelihood that contracts within the scope of this statute can be created or altered by acts of perjury or fraud."  *C. Porter Vaughan, Inc. v. DiLorenzo*, 279 Va. 449, 456 (2010).  The "primary object was to prevent the setting up of pretended agreements and then supporting them by perjury."  *Reynolds v. Dixon*, 187 Va. 101, 106 (1948).

Here, *both* USA and Fisher personnel testified that they negotiated the USA Core Policy, agreed to it, and that it accurately reflected their understanding of the parties' arrangement.  JA3068 (Bo Fisher testifying that the USA Core Policy "represented the discussion that [he] had" with Frank Doria); JA2791 (Doria testifying that the USA Core Policy was an "accurate recitation" of his understanding of the parties' core arrangement); *see also* JA222 (¶ 9) (Trapani

stating that "[t]he USA Core Policy document . . . is a true and accurate outline of that program and reflects the arrangement that we agreed to and followed with Fisher").  Fisher and USA then abided by the terms of their program outlined in the USA Core Policy for many years until Remy came along (and for several years even after Remy arrived).  Remy's effort to get the USA Core Policy excluded from evidence because it was unsigned, when both men who negotiated it have always agreed that it is real and represents the actual terms of their agreement, cannot stand.

Equally important, the USA Core Policy here is not the source of any breach of contract claim.  The Policy is a simple piece of evidence that—along with the uniform testimony of executives from both companies and business practices, discussions, and other agreements between the parties—shows that Fisher, not Remy, owned the cores in 2018.

**B.    The district court properly rejected Remy's various statute of frauds arguments on five independent grounds.**

There are two equally inapplicable statutes of frauds here: Va. Code § 8.2-201 and Va. Code § 11-2(8).  On appeal, Remy appears to admit that it raised Code § 11-2(8) for the first time during the trial, and collapses its arguments under that statute with those addressing Code § 8.2-201.  Op. Br. 35 (asserting error only "for the same reasons the District Court failed to correctly apply . . . Code § 8.2-201").

Analyzing the statutes of frauds together, the district court properly rejected

Remy's arguments on five independent grounds.

### 1.    The USA Core Policy is not a "contract for the sale of goods."

The commercial statute of frauds applies to "a contract for the sale of goods

for the price of $500 or more."  Va. Code § 8.2-201(1).  "A 'sale' consists in the

passing of title from the seller to the buyer for a price."  *Id*. § 8.2-106(1).  The

district court reasonably concluded that the USA Core Policy is not a contract for

the sale of goods.  JA1675.

The USA Core Policy outlines a "program" for the handling of cores

between the two companies.  It bears none of the hallmarks of a contract for the

sale of goods.  Under the 1-for-1 exchange program, neither party sold cores to the

other.  Instead, Fisher stopped paying for cores in exchange for an agreement that

Fisher would return one core for each rotating-electrical part it bought.  JA235.  As

the district court reasoned, the USA Core Policy is no contract for the sale of goods

because "[t]he document does not specify a quantity of goods or the price for those

goods, and the document does not require Fisher to buy goods or obligate Fisher to

purchase a minimum amount of goods.  It is unlike the purchase orders used

between Fisher and USA/Remy."  JA1675.

Remy appears to contend (at 25–26) that the USA Core Policy is a contract

for the sale of goods on the theory that Fisher sold its core inventory to USA for

21

the credits.  But the parties agreed that if Fisher stopped buying, Fisher "wouldn't have to repay USA for any core reimbursement payments received to date," and the "net result is that the cores are wholly owned by Fisher at the end of this process."  JA3508.  Likewise, Frank Doria and Bo Fisher—the two men who personally negotiated and agreed to the Policy—consistently testified that USA did *not* buy Fisher's cores through the incentive payments.  JA2789 ("Q. Was USA in the process of buying Fisher's cores with every credit it issued? Doria: No, we were not."); JA3077, JA3079–80 (Fisher).

Remy also relies (at 26–29) on case law that addresses how the statute of frauds applies to hybrid contracts for the sale of goods *and* services.  That case law is inapt because the USA Core Policy is not a hybrid contract, and no party maintains that it was a contract for services.  The question, instead, is whether the document was a contract for the sale of goods.  It was not.

### 2.    The USA Core Policy satisfies the exception for written confirmations of oral agreements.

Next, there is an exception to the statute of frauds that applies "between merchants" when "within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents."  Va. Code § 8.2-201(2).  The district court reasonably held that this exception applies.  JA1675–76.

The USA Core Policy itself was a "writing in confirmation of the contract" that Frank Doria received and did not object to. Doria testified that he received the USA Core Policy from Bo Fisher because he negotiated the document with him in 2004 and 2005. JA2791; JA2792 (Q. But do you remember, in fact, receiving this at some point? A. Yeah."). And Doria never objected to the USA Core Policy because, as he testified, it was "an accurate recitation of the core devaluation program that USA and Fisher followed." JA2787; JA2791.

While Remy contends (at 33) that there is no evidence USA ever received the Policy, Remy ignores Doria's testimony that he "receiv[ed]" the USA Core Policy. JA2792. Bo Fisher also testified that the USA Core Policy "represented the discussion that [he] had" with Frank Doria. JA3068. The district court believed Doria's sworn testimony in concluding that this exception applies. JA1675–76. There was no clear error in that factual finding. On this ground alone, this Court can affirm on the statute of frauds.

### 3. The USA Core Policy satisfies the party-admission exception.

Under the statute of frauds, an unsigned contract remains enforceable "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract . . . was made." Va. Code § 8.2-201(3)(b). The district court rightly held that this exception applies, too. JA1676.

23

Doria testified at trial that he recalled negotiating the USA Core Policy, that he agreed to abide by its terms, and that it accurately reflected his understanding of the parties' arrangement. JA2791–92. Doria was a senior USA official who became a Remy employee after Remy bought USA. JA2762. Doria then remained the primary liaison from Remy to Fisher until Fisher terminated the relationship in mid-2018. JA2763.

Remy wrongly contends that Doria's testimony does not count because he was no longer a Remy employee at the time he testified about the Policy in this case. Op. Br. 34. It cannot be that Remy's takeover of USA years later allows Remy to escape the testimony of the USA employees who made the original agreements. Remy's argument makes even less sense because by the time of trial, Remy was a holding company with no employees at all. That Remy's corporate designee said, "I don't know if they agreed to [the USA Core Policy]," JA4430–31, makes sense because he was not there. But the USA executive (who later became a Remy executive and continued managing the Fisher relationship) who *was* there acknowledged the agreement in detail. Remy cites no authority for the idea that its later purchase of a contracting party allows it to disclaim that document ignoring the objections of those who actually negotiated it. The district court reasonably considered Doria's testimony as a party admission fair to use against Remy.

### 4. The USA Core Policy was incorporated into the signed 2012 LOU.

Virginia's statute of frauds also does not apply if the parties incorporate the unsigned document into a later signed agreement. *See Logistics Transp. Co. v. Timber Trucking Co.*, 141 F.3d 1158 (4th Cir. 1998) (unpublished). In *Timber Trucking*, this Court held that Virginia's general statute of frauds did not bar the admission of an unsigned agreement even though "the signed writing [] does not expressly refer to the unsigned writing." *Id*. The Fourth Circuit reasoned that because the signed writing "show[s a] substantial connection with" the unsigned writing, the statute of frauds did not apply. *Id.* As in *Timber Trucking*, the district court here rightly held that the USA Core Policy was incorporated into the LOUs. JA1675.

The signed LOUs referenced the monthly payments that originated exclusively in the USA Core Policy. The 2012 LOU stated that the parties would "spe[e]d up" the original 12-year term for the ongoing incentive payments, and that the remaining payments would be made in full "over the next 36 months." JA3485. Elsewhere, the 2012 LOU incorporated the USA Core Policy by acknowledging that other "agreements" and "program[s]" existed between the parties and would continue. JA3485. The 2015 and 2016 LOUs included similar language about other programs that were continuing. JA125, JA134. And Doria testified that the USA Core Policy was later incorporated into the 2012, 2015, and

25

2016 LOUs.  JA2795, JA2806, JA2836 (Doria testifying at trial that language in LOUs about the "continuation of current programs" "includ[ed] the USA/Fisher core policy"); *see also* JA5509 (Nichols testifying that "Remy took over the existing agreement that USA had.  So that was the agreement that was already in place, and Remy continued on that agreement.").  Doria himself even signed the 2012 LOU for USA, JA3485, and he was involved in negotiating the 2015 and 2016 LOUs for Remy.  JA2806–07.

Remy argues that every meaningful term must be incorporated in detail into the later signed writing.  Op. Br. 31.  But if that were true, the exception would never apply.  And none of the cases Remy cites involve the actual people who negotiated the original agreement testifying in unison about what they agreed to, and even testifying that later signed documents were meant to incorporate that agreement.  JA2795, JA2806, JA2836.  The later signed LOUs clearly refer to the earlier USA Core Policy and embrace it.  They would make no sense if the USA Core Policy did not exist.

### 5.    The general Virginia statute of frauds also does not apply for other reasons.

Even if this Court went beyond Remy's brief (at 35) and independently addressed the general statute of frauds, Va. Code § 11-2(8), Remy's arguments would fail.

26

First, Remy raised Va. Code § 11-2(8) for the first time during a witness examination at trial. JA2773–74. That was far too late. The statute of frauds must be raised early, usually in a pleading. Fed. R. Civ. P. 8(c)(1) (requiring the "statute of frauds" to be "affirmatively state[d] in pleading); *Hardy-Latham v. Wellons*, 415 F.2d 674, 677 (4th Cir. 1968) (holding that because of "the failure of plaintiff's counsel to plead the Statute of Frauds," "plaintiff must be held to have waived this objection"). And Remy cannot claim surprise: after all, it *used* the USA Core Policy during Frank Doria's deposition more than two years before trial, JA4084, and it argued the other statute of frauds in pretrial briefing in June 2021, JA148–58.

Raising a new statute of frauds argument at trial blindsided Fisher. It allowed no time for fact discovery on the statute's elements or exceptions, no time for research, no time for thoughtful consideration, and no time to brief it for the district court. JA2775–76. Remy raised the general statute of frauds too late, prejudicing Fisher, and this Court need not address the issue at all on appeal.

Second, even on its merits, Va. Code § 11-2(8) does not apply because Fisher did not use the USA Core Policy to "bring" or "maintain" an action, but only to defend against Remy's claim.

The statute of frauds states that "no action shall be brought" or "maintain[ed]" on certain unsigned contracts. Va. Code § 11-2(8). That means

27

that a party cannot sue another to enforce such a contract. But Fisher did not sue Remy to enforce the USA Core Policy. Fisher was sued by Remy, and then sought at trial only counterclaim damages for injury to Fisher's business from Remy's breach of its separate, signed obligation in the LOUs to keep Fisher competitive. Fisher used the USA Core Policy as a piece of evidence supporting extensive, cumulative testimony by at least seven fact witnesses that Fisher owned the cores. Fisher's ownership of the cores was a defense against Remy's claims, all based on Remy's allegation that it owned the cores.

This statute of frauds does not apply when the unsigned contract is not used to "maintain" or "bring" an action, just as the district court reasonably concluded. JA2785 (district court ruling that "[f]or all the reasons previously stated in Docket Number 249, and given the express language of the statute, I'm overruling your objection" to the USA Core Policy).

These five separate reasons amply support the district court's ruling that the USA Core Policy was admissible.

## C. Any error in admitting the USA Core Policy was harmless.

Finally, any supposed error in admission of evidence is "subject to harmless error review." *Kozlowski v. Hampton Sch. Bd.*, 77 F. App'x 133, 146 (4th Cir. 2003). "An error is harmless when this Court can say with fair assurance, after pondering all that happened . . . that the judgment was not substantially swayed by

28

the errors." *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 531 (4th Cir. 2021). Any error was harmless.

First, even without the USA Core Policy, Frank Doria, Bo Fisher, and other witnesses provided testimony about the parties' core program that mirrored the terms in the USA Core Policy. "Improper admission of evidence which is cumulative of matters shown by admissible evidence is harmless error." *United States v. Abu Ali*, 528 F.3d 210, 231 (4th Cir. 2008).

Fisher and USA were business partners for nearly 20 years, and both Doria and Bo Fisher testified at length during trial about the parties' business relationship. JA2763 (Doria), JA3067 (Bo Fisher). Their testimony about the parties' relationship was independently admissible, as they were the executives who acted on behalf of USA and Fisher with personal knowledge of the core programs between the parties. Fisher thus did not need the USA Core Policy to establish the terms of the Fisher/USA core program.

Second, even without the USA Core Policy, Fisher presented overwhelming evidence at trial that Remy did not own Fisher's core inventory. Two former USA executives testified that USA did not buy Fisher's core inventory. JA2789 (Doria trial testimony: "Q. Was USA in the process of buying Fisher's cores with every credit it issued? A: No, we were not."); JA225 (¶ 15) (Trapani Declaration: "USA never bought or owned Fisher's core inventory."). When Remy bought USA, the

purchase agreement between them listed all customers holding cores owned by USA—and did not list Fisher. JA8614.

Equally important, Remy produced no contract with Fisher that states that USA or Remy owned cores in Fisher's possession. JA2458 (Nichols explaining that when Remy bought a customer's core inventory, it did so in signed contracts directly with that customer, and that Remy never did that with Fisher); *see also* JA2293–97 (similar testimony from Pittas). Nor did Remy possess complete records of the 1-for-1 exchange, JA2574–75, unlike Fisher, which produced comprehensive records showing that Fisher already *over*-returned cores to Remy. JA3267.

Thus, even if the district court erroneously admitted the USA Core Policy, "the judgment was not substantially swayed by the error[]" given the other admissible evidence that Fisher presented. *Wickersham*, 997 F.3d at 531.

## II. The district court properly determined on summary judgment that Remy committed the first material breach and Fisher did not waive it.

Fisher's first material breach defense is rooted in Remy's "keep competitive" obligation in the signed LOUs. The contract was "predicated upon REMY keeping Fisher competitive in the marketplace in every way." JA125, JA134 (¶¶ 2–3). Remy witnesses admitted that the "keep competitive" clause was a material contractual obligation. JA1707. Fisher showed that Remy breached this term by, among other things, providing terrible order-fill rates in late 2017 and

30

early 2018.  The district court agreed, noting that "Remy's order-fill issues are well-documented and the opposite of trivial."  JA1683.  The district court properly granted summary judgment on this point.

Nor did Fisher waive Remy's first material breach.  The law sets a high bar for waiver—intentional relinquishment, and by clear and unequivocal evidence. No reasonable jury could have found for Remy on that point, so the district court properly handled it.

### A.  Undisputed facts and concessions established that Remy committed the first material breach when it failed in its obligation to keep Fisher competitive.

The record here is filled with evidence of Remy's sustained and severe performance issues in 2017 and 2018.  Remy's documentary evidence and witness testimony confirmed that competitive order-fill rates were in the low-to-mid 90s. JA2976–77, JA264 (¶¶ 18–19).  Yet in 2017 and 2018, Remy's order-fill rates were often *far below* the low-to-mid 90s.  JA2524 (Nichols, a former president of Remy, testifying that Remy's fill rates were "embarrassing").  In fact, Fisher's order-fill data shows that during the 15-month period between March 2017 and May 2018, Remy's monthly order-fill rates never rose above 80% and were consistently in the 60s and 70s.  JA1114–41, JA1143–45.  In 2017 and 2018, Fisher repeatedly complained to Remy about its poor fill rates because Fisher was "losing lots of sales."  JA1710.

31

Fisher explained all this evidence and more to the district court in its first summary judgment brief. JA252–79. Remy's opposition then did not respond to Fisher's facts. JA177–88. At the hearing, the Court pressed Remy about "failing to respond to undisputed statements of fact" in Fisher's brief. JA1304. Remy's counsel stated, "I think we concede that, Your Honor. I think their factual statements are correct." JA1304.

Remy's failure to contest the facts, and its direct concession, prompted summary judgment, both against Remy's breach of contract claim and in favor of Fisher's. JA1681, JA1306–07 (granting summary judgment against Remy's claim); JA2029–38 (granting summary judgment for Fisher on its breach of contract claim, sending damages issues to the jury). As the district court ruled, the "record *abounds with undisputed facts and admissions by Remy*, some outlined in the court's previous opinion and some summarized in the briefs of the parties, regarding Remy's poor performance." JA2034 (emphasis added). The district court aptly refused to let Remy "evade summary judgment by contesting facts it previously conceded as true and conveniently switching theories when it suits them." JA2034; *Gambill v. United States*, 276 F.2d 180, 181 (6th Cir. 1960) ("[I]t is clear that a court may act upon facts conceded by counsel equally as if established by the clearest proof.").

Remy contends (at 41) that Remy's duty to keep Fisher competitive is too vague to support a first material breach defense. But Remy never made that argument in the district court, and so has waived it on appeal. And regardless, any vagueness argument runs headfirst into undisputed facts. For example, Nichols agreed that Remy's order fill rate needed to be in the low-to-mid 90s, as Remy's "minimum fill rate has always been 95 percent. . . . [T]raditionally we're a mid 96 and as high as 97 percent fill rate company." JA5317. Nichols testified that after the Torque acquisition, Remy provided "a lower fill rate" in 2017 and 2018, and added that Remy's fill rates became "embarrassing." JA265. He also agreed that "competitive shipping times" and "competitive order fill rates" were "key" aspects of keeping customers competitive. JA5651. As the district court rightly observed, "the fill rate was one part of the equation to keep Fisher competitive." JA2035.

Further, Remy's breach was the definition of "material." *Horton v. Horton*, 254 Va. 111, 115–16 (1997) (a "material breach" is a "failure to do something that . . . defeats an essential purpose of the contract"). Nichols admitted that "Remy knew that keeping Fisher competitive in the marketplace in every way was an essential purpose of the agreement." JA1707. He also agreed that keeping customers competitive "is an important concept [] from the supplier's standpoint." JA1707.

33

Remy did not seriously contest below that its duty to timely ship products to Fisher was an essential purpose of the parties' agreement. Nor does it contest this point on appeal. Thus, the district court rightly concluded that Remy's "breach was material because it defeats an essential purpose of the contract." JA2035. Remy was Fisher's "primary supplier" but was not supplying.

Last, Remy's breach also undisputedly occurred before Fisher's alleged breach. Remy's severe performance issues began in early 2017 and continued through 2018. JA1708–12 (cataloguing evidence of Remy's continuing breach). By comparison, Remy's counsel conceded that in Remy's view, "Fisher's breach occurred on July 1, 2018," after Fisher provided notice of its termination in June 2018 and well after Remy's repeated performance failures in 2017 and early 2018. JA1926. Therefore, as the district court correctly concluded, JA2035–36, Remy's breach occurred first.

### B.     The APSG term sheet is a sideshow that cannot help Remy.

Remy's brief goes on for pages about legal doctrines of integrated contracts. Op. Br. 36–39 (asserting that no fewer than eight documents, including an unsigned APSG term sheet, made up the "contract" between Remy and Fisher, while also denying that the USA Core Policy was among those). Remy may believe that an APSG term sheet provided greater detail on what "keep competitive" meant, and provided a contract remedy for it. Op. Br. 42. But Fisher

never relied on the APSG term sheet for any aspect of its claim, and none of the

five contracts that Fisher and Remy signed ever mentioned the APSG term sheet.

To the contrary, Fisher's counterclaim—as pled and proven—was premised on the

"keep competitive" provision in the LOUs, with the specific requirements of that

obligation supported by the testimony of numerous Remy witnesses, as well as

industry standards and usage of trade evidence under Va. Code § 8.1A-303.

JA1854.

Even if the APSG term sheet were relevant, it still would not help Remy.

The APSG term sheet specifies that Remy was guaranteeing a 93% order fill rate

to the APSG buying group (in which Fisher was a participant) as a whole.  Op. Br.

42 ("The APSG provision clearly and plainly establishes a 93% or higher purchase

order fill guarantee from Remy.").  Remy's order-fill rate was far below 93% in

2017 and 2018.  JA265.

And the remedy provided in the APSG term sheet is not exclusive.  Remy

argues (at 39, 42–43) that because the APSG term sheet allowed Fisher to charge

Remy penalties for poor shipping rates, Fisher had no other remedy (like

termination of the agreement and breach of contract damages) for poor fill rates.

But under well-settled Virginia law, a "remedy provided will be exclusive of other

possible remedies only where the language employed in the contract clearly shows

35

an intent that the remedy be exclusive." *Bender-Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585, 588 (1971).

The APSG term sheet contains no language suggesting exclusivity, and Remy's brief cites none. Nor would it make sense to say that a party cannot sue for damages for repeated breaches just because the non-breaching party accepted a discount on the insufficient orders. After all, Fisher showed roughly $2 million in lost profits from orders Remy failed to adequately fill. JA3510. That amount far outstrips the 5 percent discount Remy gave on those poorly-filled orders. JA2410 (stipulation that Remy paid $196,001 in order-fill penalties). Thus, order-fill penalties had no effect on Fisher's right to terminate the relationship and seek contract damages as Remy's admitted failures went on and on. Remy's argument about contract integration and the APSG term sheet is a sideshow with no effect on Fisher's first material breach defense.

### C.    The district court properly concluded that Fisher did not waive the first material breach defense.

Contrary to Remy's contention (at 44–48), no reasonable jury could find that Fisher waived its first material breach defense. Fisher repeatedly objected to Remy's poor performance and pushed Remy to perform properly. The district court rightly rejected Remy's waiver theory at summary judgment.

Waiver of a first material breach requires both knowledge of the breach and "an intent to relinquish that right." *Horton*, 254 Va. at 117. The bar is high: Remy

must show an intent to relinquish "by clear, precise and unequivocal evidence."
*Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc*., 267 Va.
642, 652 (2004). Without "unequivocal evidence" that Fisher *intended* to
relinquish its right to claim a breach, Remy had no right to a jury question on that
topic. *Stuarts Draft Shopping Center, L.P. v. S-D Assocs.*, 251 Va. 483, 489–90
(1996) (holding that the trial court should not have sent a contract waiver issue to
the jury when the evidence could not rise to the "clear, precise, and unequivocal
evidence" standard).

Virginia law holds that a party cannot waive the first material breach defense
by continuing performance if—as Fisher did—it objects to the breach. In *Horton*,
the seminal Virginia case on the first material breach doctrine, the parties executed
a contract that required Mrs. Horton to sign a power of attorney. *Horton*, 254 Va.
at 113. Mrs. Horton failed to do that, but the parties performed for several years
anyway. *Id*. When a dispute arose, the Supreme Court of Virginia held that Mrs.
Horton committed the first material breach. *Id*. at 116. While she raised the same
waiver point that Remy does here, the court rejected it:

> Here, the evidence affirmatively showed that Mr. Horton did not intend
> to relinquish his contractual right to secure a power of attorney from
> Mrs. Horton. . . . [B]efore each settlement, Mr. Horton requested that
> Mrs. Horton sign the power of attorney as required by the 1991
> contract. These repeated requests establish that Mr. Horton did not
> waive his right to assert Mrs. Horton's failure to sign the power of
> attorney as an excuse for his nonperformance.

*Id*. at 117; *see also Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142 (2001) (finding a first material breach despite the other party performing the contract for several more months); *Stuarts Draft Shopping Center*, 251 Va. at 490 (holding that a delay in enforcing a contract right, along with "passive acquiescence in a partial performance" failed to "establish an intent to relinquish the right to full performance" as a matter of law). Virginia federal courts have done the same. *E.g.*, *Tandberg, Inc. v. Advanced Media Design, Inc.*, 2009 WL 4067717, at *4 (E.D. Va. Nov. 23, 2009) (Ellis, J.) (holding that the Supreme Court of Virginia "has consistently invoked the principle that if the first breaching party committed a material breach, that party cannot enforce the contract, even where the parties clearly have elected to continue performing under the terms of the contract").

The facts here are on all fours with *Horton*. Fisher *often* complained to Remy in 2017 and 2018 about its poor performance. JA1709–11 (¶¶ 15, 17, 19) (citing emails from Fisher to Remy complaining about Remy's performance); *see also* JA166 (¶ 10) ("In 2017 and 2018, I (and others) at Fisher repeatedly complained to Remy about Remy's performance issues and told senior Remy personnel that Remy's performance issues were hurting Fisher."). Remy even acknowledges this in its brief. Op. Br. 44, 45 (admitting that Fisher "complained" about order fill, "insisted" that Remy provide "certain product lines and quality," and "insist[ed] that Remy meet its performance guarantees.").

38

Fisher's argument here is even stronger than in *Horton* because unlike in that case, Fisher delayed terminating the relationship because Remy misled Fisher about the scope of the problems.  JA1709 (¶ 17) (Fisher was "misled" by Remy); *see also* JA1848–49 (internal Remy email noting that Remy was "overpromising" Fisher); JA1852–53 (March 2018 email from Fisher to Remy about Remy not shipping what it promised).  Thus, not only did Fisher contemporaneously object consistent with *Horton*, but Remy's own misdeeds prolonged its failing relationship with Fisher.

Given these undisputed facts, the district court correctly held that Fisher did not waive its first material breach defense.  JA2036–39.  Citing *Horton*, the district court explained that "Virginia courts have rejected the argument that a party waives this defense by continuing to perform after the initial material breach." JA2036–39.  As in *Horton*, the district court held that "Fisher [] often complained to Remy in 2017 and 2018 about Remy's poor performance, and Remy knew that its poor performance put its relationship with Fisher in jeopardy.  Therefore, the court finds that Fisher did not waive its first material breach defense."  JA2036–39.

Remy ignores all this case law and focuses narrowly (at 46–48) on *Virginia Polytechnic Inst. & State Univ.*, 267 Va. 642.  The court in that case did allow the waiver question to go to the jury.  But the evidence there was far different than here.  Unlike in this case, Virginia Tech did not object when IRS failed to timely

39

pay, or even merely "acquiesce," but affirmatively "requested [] no-cost extension[s]" after statements from IRS that it could not and would not satisfy its obligation to make timely payments going forward.  That is the opposite of what happened here.  *Id.* at 652–53.

Here, the undisputed facts are that Fisher complained repeatedly to Remy about its poor performance, Op. Br. 44–45, claimed "penalty" discounts based on it, and issued additional purchase orders in the usual course of business, hoping and expecting Remy's performance would improve before it could wait no longer and terminated.  *See* JA3095–96 (trial testimony from Greg Haan, Fisher's former COO, that Fisher's large seasonal order to Remy in early 2018 was "commonplace and not out of the ordinary"); *see also* JA166 (¶ 4) ("[I]t is difficult, time-consuming, costly, logistically challenging, and generally burdensome for our company to change suppliers.").

Fisher's response to Remy's breaches can hardly be considered even "acquiescing," much less providing any "clear, precise, and unequivocal evidence" that Fisher *intended* to relinquish contract rights.  *Virginia Polytechnic Inst. & State Univ.*, 267 Va. at 652.  The district court properly handled the issue at summary judgment.

**D.    Remy was not entitled to jury instructions on waiver, laches, or estoppel.**

Because Fisher did not waive the first material breach defense as a matter of law, Remy could not have been entitled to jury instructions on waiver, laches, or estoppel.  "A district court will be reversed for declining to give an instruction proposed by a party only when the requested instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case."  *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (adding that "we accord the district court much discretion" in jury instructions).  There was no abuse of discretion here.

First, Remy's argument (at 49–53) that it was entitled to jury instructions on waiver, laches, and estoppel for Fisher's breach of contract claim depends on Remy's contention that Fisher waived its first material breach defense.  Remy states (at 52) that "[t]he facts that frame a jury issue on waiver of Fisher's material first breach defense equally support instructing the jury on Remy's waiver defense to Fisher's contract breach damage claims."  Thus, because Fisher clearly did not waive its first material breach defense, Remy was not entitled to jury instructions on waiver, laches, or estoppel.

Second, the district court did not abuse its discretion on the jury instructions because waiver, laches, and estoppel are defenses to liability, and liability was not

the issue at trial.  Before trial, the district court held that Remy's material breach established liability for Fisher's breach of contract claim, leaving only damages for trial.  JA2040–41 ("The only claims that remain for trial are Remy's claim for conversion of cores (with regard to liability and damages) and Fisher's claim for breach of contract for Remy's failure to keep it competitive (with regard to timing of this breach and damages).").  And Remy never objected before or during trial that liability on Fisher's contract claim should have been left to the jury.

With liability for Fisher's contract claim established, Remy was not entitled to waiver, estoppel, or laches instructions because those are defenses to liability, not to damages.  *E.g.*, *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 331 (6th Cir. 2018) ("laches" is a "defense to liability"); *MEECO Mfg. Co. v. Imperial Mfg. Grp.*, 2005 WL 8172679, at *3 (W.D. Wash. Mar. 11, 2005) ("[E]stoppel is only a *defense* to liability."); *Fine v. Baer*, 2016 WL 4472965, at *2 (M.D. Fla. Aug. 23, 2016) ("waiver" is an "affirmative defense[] relevant to the determination of liability").  Thus, the district court did not abuse its discretion by denying Remy's request for these jury instructions.

### E.    Any error in granting judgment against Remy's breach of contract claims was harmless.

Even if the district court were wrong about first material breach and waiver of that breach, its judgment against Remy's breach of contract claim was harmless.

42

Remy's conversion claim at trial relied on the same theory, evidence, and witnesses as Remy's contract claim.

The theory of Remy's breach of contract claim, just like its conversion claim, was that it owned the cores for each product in Fisher's inventory and that Fisher wrongly "refused to pay Remy for its outstanding core balance." JA109–10 (¶ 32). All of Remy's claims hinged on that same allegation. JA112 (¶ 39(a)) (alleging for contract claim that Fisher owed nearly $6 million for holding Remy's cores); JA114 (¶ 52) (alleging for conversion claim that Fisher possessed cores rightly owned by Remy); JA5774–75 (Remy arguing that on its breach of contract claim, the case hinged on a single question: whether the cores in Fisher's inventory "were entirely owned by the remanufacturer [Remy]."). The jury answered that question. Dkt. No. 330 at 2 (verdict form: "Did Remy prove by a preponderance of the evidence that Fisher converted any cores owned by Remy? Jury answer: No.").

Remy has never contended that its breach of contract claim relied on different evidence, documents, or witnesses than its other claims. Indeed, all the pertinent contracts were admitted and analyzed at length at trial.

Courts have held that a district court's dismissal of one claim was harmless error when the plaintiff's claims lost at trial relied on the same theory, evidence, and witnesses. *E.g.*, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 n.12

(10th Cir. 2007) ("Because the same allegations underlying their claims for constructive discharge . . . failed before the jury . . . any error in dismissing [those claims] was harmless under our precedents."); *George v. City of Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992) (holding that dismissal of claim was "harmless" because the jury rejected the same theory as part of another claim); *Hansen v. Isuzu Motors Ltd.*, 289 F. App'x 621, 626 (4th Cir. 2008) (finding any error harmless when the jury ruled on "essentially the same claim" in another count and rejected it). Any error by the district court was harmless.

## III. Remy abandoned its unjust enrichment claim, and in any event, the express contracts bar it.

Fisher sought summary judgment on Remy's unjust enrichment claim because contracts governed the parties' relationship. JA1723–26. Remy did not dispute this argument in its opposition to summary judgment. JA9755–76.

After Remy failed to oppose summary judgment on unjust enrichment, the district court raised this exact point at the hearing: "it appears to the Court that everyone's position is the contracts govern in this case. And everyone has taken that position. So I don't see how unjust enrichment can still be available if the contracts govern." JA1939. Remy's counsel responded: "I believe that's correct, Your Honor." JA1940.

The court then granted Fisher's motion for summary judgment on unjust enrichment. "Remy has not contested Fisher's motion for summary judgment on

this claim and conceded at the hearing that this claim cannot be sustained in light of the parties' express contractual arrangement." JA2037; *see Brookshire v. C.F. Sauer Co.*, 63 F. App'x 736 (4th Cir. 2003) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal."). There is no ground for Remy to raise unjust enrichment again now.

Even apart from Remy's waiver, "the existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." *CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 519 (2018).

Remy contends (at 48–49) that it can advance an unjust enrichment claim because its breach of contract claim failed. But the sole case it cites does not support Remy's argument. In *Ricks v. Sumler*, 179 Va. 571 (1942), one party had fully performed its half of a contract, but could not enforce the contract for contract damages because of the statute of frauds. *Id*. at 577–78. The court allowed the performing party, who had committed no breach, to pursue unjust enrichment to recover the fair value of her labor, which the other party had benefited from and never paid for. *Id*.

*Ricks* is far different from this case. Here, the contracts binding Fisher and Remy are sound and enforceable. In fact, the jury awarded Fisher $1.8 million against Remy for breach of contract on Fisher's request to enforce the contracts.

That Remy lost its right to insist on further performance by Fisher under an

enforceable contract because Remy performed poorly and committed the first

material breach does not erase the contract and open the door to unjust enrichment.

*E.g.*, *Mulugeta v. Ademachew*, 407 F. Supp. 3d 569, 592 (E.D. Va. 2019)

(dismissing an unjust enrichment claim because "there is an express contract

governing" even though the first material breacher could not enforce that contract);

*Durkin v. MTown Constr., LLC*, 2018 WL 1304922, at *7 (Tenn. Ct. App. Mar. 13,

2018) (noting that when the plaintiff committed the first material breach, he

"cannot bypass these holdings on the breach of contract claims by attempting to

recover under the theory of unjust enrichment").

Finally, there was no harm to Remy in the dismissal of its unjust enrichment

claim. Remy took its conversion claim to the jury, which turned on the same main

argument—whether Fisher or Remy owned the cores for the products in Fisher's

inventory. The jury's clear rejection of Remy's theory of the case shows that

injecting unjust enrichment into the trial would have changed nothing about the

outcome.

## IV. Remy is entitled to nothing under the Hoffman and Core Base Agreements because the jury already accounted for them.

Remy asserts, in one paragraph, that it is entitled to something under the

Hoffman and Core Base Agreements (the latter of which Remy calls the KOI

agreement). Op. Br. 49. Remy ignores what happened at trial.

In short, the jury already reduced Fisher's damages by $285,000 to account for Hoffman and KOI.  As Fisher's counsel explained to the jury during closing argument, Fisher proved damages of $2,297,474.  JA3417.  But Fisher's counsel reduced its requested damages by $196,001 to reflect order-fill penalties that Remy already paid Fisher.  JA3417–18.  Fisher's counsel also reduced its damages request by an additional $285,196 to account for the "KOI and Hoffman acquisitions."  JA3418.  After incorporating those reductions and explaining them to the jury, Fisher's revised damages request during closing was $1,816,277—exactly what the jury awarded Fisher in its verdict.  Dkt. No. 330 at 3.

The district court properly recognized that the jury already accounted for the Hoffman and KOI balances in denying Remy's post-trial motion for setoff. The court explained that "what Remy now asks for is an improper double recovery. . . .  There is no factual basis to award an additional set-off that encompasses . . . the Hoffman and KOI acquisitions when the jury obviously reduced the award to account for those matters."  JA3731–32; *see also Bright v. Tishman Const. Corp. of New York*, 1997 WL 419195, at *4 (S.D.N.Y. July 25, 1997) ("I find that the pension should not be offset because the jury has already accounted for it."); *Huey v. Super Fresh/Sav-A-Ctr., Inc.*, 2009 WL 3834218, at *2 n.17 (E.D. La. Nov. 16,

2009) (same).  To the extent Remy now seeks more than $285,000 on the Hoffman

or KOI issue, Remy never asked the jury for that, and so waived the issue.[2]

Remy's argument entirely ignores what happened in the trial court—it offers

no contrary explanation for what the jury did or reason to think the court was

wrong in rejecting Remy's ask as seeking double recovery.

## V.    The district court properly allowed Kornafel to testify about industry practices.

Remy argues that Fisher's expert Peter Kornafel improperly testified about

the meaning of contracts, offered legal opinions, and expressed an "ultimate

opinion" that Fisher owned the cores.  Op. Br 53–54.  But Remy never objected at

trial, which forfeited this concern.  And regardless, the district court did not abuse

its broad discretion in allowing Kornafel's testimony, which focused on the way

the automotive industry operates and how core ownership is generally handled—

proper areas for expert testimony.  *Wickersham*, 997 F.3d at 531 (abuse of

discretion standard governs review of admission of expert testimony).

### A.    Remy waived any objection to Kornafel's testimony.

Remy never objected during the trial to any of the Kornafel testimony it

appears to challenge now.  Although Remy now offers general complaints, none of

---

[2] Even if the jury had not already accounted for the Hoffman and KOI amounts, the district court rightly held that Remy's claims under those agreements would be barred by the first material breach doctrine anyway.  JA1683–84.

the transcript pages it cites contains any objection by Remy. *See* Op. Br. 19, 53–54
(citing JA3024, JA3028, JA3035, JA3037, and JA3052, none of which contain any
objection by Remy).

Remy filed a *Daubert* motion against Kornafel before the trial. JA236–
37. The district court analyzed Kornafel's report at length, JA1688–92, and
rejected Remy's motion. JA1692 (holding that "Kornafel bases his opinions on
industry-specific experience, not an interpretation of the parties' contracts").
Equally important, the district court invited Remy to object at trial if it thought
Kornafel's eventual actual testimony was improper: "[T]he court may revisit this
ruling at trial if Kornafel's testimony crosses the line into contract
interpretation." JA1692.

But Remy never raised it again when the actual testimony came in. *See*
*United States v. Grullon*, 996 F.3d 21, 30–31 (1st Cir. 2021) ("[W]hen a judge
issues a preliminary, conditional, or 'tentative' ruling that clearly invites the party
to offer the evidence at trial, then the party has an obligation to raise it again to
preserve the claim."); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th
1288, 1297 (11th Cir. 2021) ("[I]f the court's ruling is tentative or without
prejudice, there is no definitive ruling on the objection. . . . [and] the objecting
party must renew its objection at trial to preserve a claim of error for appeal").

Thus, Kornafel's testimony is subject to plain-error review only. *United States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015) (holding that where a motion in limine had not been "definitively" ruled on, and the complaining party "failed to renew the objection at trial," review was for plain error only).

Also, Remy itself elicited much of Kornafel's supposedly objectionable testimony on cross-examination. His statement that "there is no contract that says Remy owns those [cores]," JA3052, was answering a question from Remy's own counsel about the basis of his opinion. Remy cannot now challenge testimony that it generated. *United States v. Neal*, 78 F.3d 901, 904 (4th Cir. 1996) (rejecting party's argument about impermissible testimony because "most [of the statements] were elicited by his own attorney from a government witness during cross-examination").

### B.    The district court properly allowed Kornafel to testify about industry practices.

At trial, Kornafel was admitted as an expert—without objection from Remy—"in the automotive aftermarket with respect to core-related programs and practices, automotive buying groups, and inventory management." JA3025. As a result, Kornafel naturally talked about the nature and intent behind automotive buying group programs, as well as how those programs customarily relate to other contracts in the industry. *E.g.*, JA3035–37. As the former head of a major automotive buying group, Kornafel was particularly well equipped to explain to

50

the jury the nature of buying groups and the documents associated with them. JA3035–37.  And as an industry expert, Kornafel also testified about cores, core-related practices, and the custom in the industry for resolving core-related issues in contracts.  JA3035–37.

Kornafel did not interpret specific language in the contracts at issue or render a legal opinion about anyone's ultimate liability for conversion.  Courts have held that industry and contract experts like Kornafel can testify generally about contracts without defying the Rules of Evidence.  *E.g.*, *Walmart, Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1114 (8th Cir. 2020) ("Federal courts routinely allow contract experts to testify regarding the meaning of contract terms when the meaning depends on trade practice."); *Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 78 (2d Cir. 1995) ("Hall's testimony as to reinsurance industry custom and practice was, therefore, admissible to the extent it was relevant to the meaning of the contract.").  Because Kornafel appropriately limited his testimony to general industry practices about cores and automotive buying groups, he did not offer an inadmissible legal opinion.

Finally, any error in admitting anything Kornafel said was harmless.  *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021) (erroneous admission of expert testimony is harmless if "there remains sufficient admissible evidence to uphold the jury's verdict").  Fisher presented overwhelming other evidence to

show that Remy did not own Fisher's core inventory, including the testimony of

USA/Remy executives themselves. *See supra* Argument § I.C.

## <u>CONCLUSION</u>

This Court should affirm the judgment below in all respects.


Dated:  September 26, 2022          Respectfully submitted,

                                    */s/ Matthew A. Fitzgerald*
                                    Matthew A. Fitzgerald
                                    Ryan D. Frei
                                    Lyle D. Kossis
                                    MCGUIREWOODS LLP
                                    Gateway Plaza
                                    800 East Canal Street
                                    Richmond, VA 23219
                                    T: (804) 775-1134
                                    F: (804) 698-2168
                                    rfrei@mcguirewoods.com
                                    mfitzgerald@mcguirewoods.com
                                    lkossis@mcguirewoods.com

                                    *Counsel for Defendant-Appellee Fisher Auto Parts, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 11,954 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2022, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Fourth Circuit using the

appellate CM/ECF system, which will also serve counsel of record.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald